**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **EARTH TECH, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:05cv172** |
| | ) | |
| **UNITED STATES FIRE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This insurance coverage dispute arises out of a motor vehicle accident in Florida. An automobile struck a tractor-trailer that was backing into a work site aided by plaintiff's employee who was acting as a flagman for the tractor-trailer. The automobile's occupant suffered serious injuries and has sued plaintiff, among others, alleging with respect to plaintiff that its employee's negligence in acting as a flagman caused the accident. Plaintiff, in turn, seeks here a declaration that defendant, the insurer of plaintiff's subcontractor, has a duty to defend the plaintiff in the lawsuit brought by the injured automobile occupant.

### I.

Because the parties' sole disagreement concerns the interpretation of the insurance contract, the parties have filed a Joint Statement of Undisputed Facts, and cross-motions for summary judgment. Accordingly, the material facts recited here are undisputed and derived from the parties' stipulation and pleadings.

**Background**

Plaintiff Earth Tech, Inc. ("Earth Tech"), is a California corporation with its principal

place of business in Long Beach, California.  It is in the business of providing services in the

areas of global water management, environmental and waste remediation, architecture,

engineering, construction, and transportation.  Defendant United States Fire Insurance Company

("U.S. Fire") is a Delaware corporation with its principal place of business in Morristown, New

Jersey.  U.S. Fire is in the business of providing property and casualty insurance products and

services.

  This dispute arises out of an automobile collision that occurred on September 25, 2002,

involving a vehicle driven by Annette Carey and a 1999 Peterbilt diesel semi-tractor and attached

trailer (the "tractor-trailer") operated by an employee of Freehold Cartage, Inc. ("FCI").  On the

day of the accident, Earth Tech employees were working at the St. Mark's Refinery Complex

pursuant to a contract with the Florida Department of Environmental Protection.  Earth Tech

subcontracted part of this work to Capitol Environmental Services, Inc. ("Capitol"), a Virginia

corporation with offices located at 8339 Boone Boulevard, Vienna, Virginia.  The subcontract

required Capitol to "provide all labor, equipment, materials, supplies, and permits necessary to

properly perform the transportation and disposal of materials."  The "materials" at issue were

Benzene contaminated liquids.  Pursuant to its subcontract with Earth Tech, Capitol was required

to remove the Benzene contaminated liquids from the St. Mark's Refinery Complex and

transport them via vacuum tank truck to an acceptable state facility.  To accomplish this, Capitol

hired FCI to transport the Benzene contaminated liquids from the St. Mark's Refinery Complex.

The contract between Capitol and FCI was for the provision of "transportation services,"

specifically the transportation of the benzene contaminated liquid from the St. Mark's Refinery in

Tallahassee, Florida to Industrial Water Services in Mobile, Alabama.  The quote provided by

FCI required that the transportation services would be performed by a "tanker vac (any type)," but did not specify a particular vehicle, driver, or route.  The quote also did not include certain terms of the contract which were later supplied orally, including the date the transportation services were to be performed.  No Capitol employees were present at the St. Mark's Refinery on the day of the accident.

Prior to the accident, Peter Blash ("Blash"), an FCI employee, arrived at the Refinery Complex with the requested tractor-trailer and attempted to back the vehicle into the Complex with the assistance of an Earth Tech employee, who operated as a flagman to direct the tractor-trailer and any oncoming traffic.  As Ms. Carey and her husband approached the refinery from the south, the tractor portion of the tractor-trailer was in the opposite lane with its lights on thereby creating the illusion that the entire vehicle was in the southbound lane.  In fact, as a result of Blash's efforts to back into the Complex, the trailer was perpendicular to the tractor and in the opposite lane of traffic.  At this point, the Carey's automobile struck the tractor-trailer and Mrs. Carey sustained serious injuries.

**The Underlying Personal Injury Lawsuit**

As a result of the accident, on or about May 14, 2003, Annette R. Carey and Grayson Robert Carey, her husband, filed a lawsuit in the Circuit Court for the Second Judicial Circuit, in Wakulla County, Florida, captioned *Annette R. Carey, et al. v. Peter H. Blash; Freehold Cartage, Inc.; and Earth Tech, Inc.*, Case No. 03-136-CA (the "Underlying Lawsuit").  The Underlying Lawsuit alleges that on September 25, 2002, plaintiff Annette Carey sustained serious injuries as a result of the accident that occurred when Mrs. Carey's vehicle collided with the tractor-trailer operated by Blash, who is also alleged to be an employee of one or both of the

-3-

other named defendants in the underlying lawsuit, FCI and Earth Tech.

The complaint in the Underlying Lawsuit asserts theories of negligence and loss of consortium against all defendants, and includes the following allegations:

    a.      On the day of the accident, Blash arrived at the St. Mark's Refinery Complex in Wakulla County, Florida in the course and scope of his employment to "load petroleum products" from the Refinery Complex.

    b.      The tractor-trailer Blash was operating was owned by FCI.

    c.      At the same time, Earth Tech was performing work at or near the St. Mark's Refinery Complex.

    d.      In conjunction with the work being performed, Earth Tech negligently undertook to direct traffic on State Road 363 while Blash attempted to back the tractor-trailer into the St. Mark's Refinery Complex.

    e.      At approximately 6:20 a.m., Ms. Carey approached the refinery in the northbound lane of State Road 363.  At the same time, the tractor portion of the tractor-trailer was in the southbound lane with its lights on, while its trailer remained in the northbound lane, thereby creating the illusion that the entire vehicle was in the southbound lane.

    f.      Earth Tech failed to provide adequate visual warning devices in the course of directing traffic.

Thus, the complaint alleges that Earth Tech was negligent in two respects: First, that it "negligently undertook to direct traffic on State Road 363, while Blash attempted to back the [tractor-trailer] into the St. Mark's Refinery complex," and second, that it failed to provide "adequate visual warning devices."  In addition, the underlying complaint alleges that as a result of Earth Tech's negligence, Ms. Carey collided with the semi-trailer and sustained severe and permanent personal injuries.

**The Insurance Policies**

Prior to the accident, Capitol had obtained liability insurance from U.S. Fire, including a Commercial Automobile Liability Insurance Policy, Policy No. 1336677777 ("the Auto Policy"), and an Excess Liability Insurance Policy, Policy No. 5520104937 ("the Excess Policy"), covering all sums Capitol legally must pay as damages because of bodily injury or property damage caused by an accident and resulting from the ownership, maintenance or use of a covered automobile. The operative dates of the U.S. Fire Auto and Excess Policies are October 25, 2001 to October 25, 2002, the time period encompassing the date of the accident at issue in the Underlying Complaint.  Both the Auto Policy and the Excess Policy were delivered to Capitol at its offices in Vienna, Virginia.

The Auto Policy's coverage grant provides, in pertinent part:

> We will pay all sums the insured must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or **use** of a covered auto.

(emphasis added).  Significantly, the Auto Policy defines "who is insured" as follows: "You are insured for any covered auto. . . . Anyone else is an insured while **using** with your permission a covered auto you own, **hire** or borrow."[1] (emphasis added).  The terms "you" and "your" are defined in the Auto Policy as "the person or organization shown as the named insured in ITEM ONE of the declarations."  Capitol is the only entity listed in ITEM ONE of the declarations page of the Auto Policy.  The Auto Policy defines "covered autos" as "any auto."  The term "Auto" is, in turn, defined as a "land motor vehicle, trailer or semi-trailer designed for travel on public roads."

--------

[1] This provision is required by Virginia's omnibus clause statute, Va. Code § 38.2-2204.

The Excess Policy states that U.S. Fire will pay the ultimate net loss in excess of all underlying insurance only after exhaustion of such underlying insurance. The Excess Policy further provides: "If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exclusion of an aggregate limit of insurance, then WE shall not pay such loss." The Excess Policy also states:

> The Definitions, Terms, Conditions, and Exclusions of the "CONTROLLING UNDERLYING INSURANCE" scheduled in Item 5 of the Declarations, in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with the provisions of this policy, or relate to the premium, subrogation, any obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement.

The Auto Policy is listed as "Controlling Underlying Insurance" in Item 5 of the Declarations page of the Excess Policy. Thus, only if the Auto Policy provides coverage will the Excess Policy coverage be triggered.

On December 17, 2004, Earth Tech tendered the defense of the Underlying Lawsuit to U.S. Fire under the Auto and Excess Policies that U.S. Fire issued to Capitol, claiming that it is an insured under both policies. On January 25, 2005, U.S. Fire acknowledged receipt of Earth Tech's tender of the Underlying Lawsuit and advised that it was investigating the tender under a full reservation of all of its rights and defenses.

**This Action**

Less than three weeks later, on February 17, 2005, Earth Tech commenced the instant Declaratory Judgment Action against U.S. Fire seeking a declaration that U.S. Fire is obligated to defend and indemnify Earth Tech in the Underlying Lawsuit under the Auto and Excess Policies U.S. Fire issued to Capitol. In its Declaratory Judgment Complaint, Earth Tech states that the

Underlying Complaint alleges that Earth Tech was "using" the semi-trailer operated by Blash and therefore, Earth Tech is an insured under the Auto Policy.  The Declaratory Judgment Complaint further states that the Excess Policy requires U.S. Fire to pay the ultimate net loss of all underlying insurance after exhaustion of such underlying insurance.  U.S. Fire's Answer to the Declaratory Judgment Complaint denies that U.S. Fire has a duty to defend or indemnify Earth Tech.  Earth Tech filed a motion for summary judgment on August 30, 2005.  At oral argument U.S. Fire made an oral cross-motion for summary judgment.  As the issues have been fully briefed and argued, the parties' cross-motions for summary judgment are now ripe for disposition.

## II.

The standard for granting summary judgment is well-established.  Under Rule 56(c), Fed.R.Civ.P., a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  In considering whether to grant a motion for summary judgment, the court must assess the evidence offered by both parties and "determine whether there is a genuine issue for trial" after viewing the evidence in the light most favorable to the non-moving party and resolving all factual disputes in that party's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To defeat a summary judgment motion, the non-moving party may not rest upon mere allegations or denials, but must "set forth specific facts showing that there is a genuine issue for trial."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In this case, the material facts are essentially uncontested and the dispute depends entirely

on whether these uncontested facts fit within the scope of the coverage provided by the two

policies.  Given this, adjudication by way of summary judgment is appropriate.

### III.

This case is what is referred to in common legal parlance as a "duty to defend" case.  In

essence, a duty to defend case is a dispute over insurance policy coverage between an insurer and

an entity claiming to be an insured under a policy issued by the insurer.  The dispute typically

arises, as here, in a declaratory judgment action in which the entity claiming coverage under the

policy seeks a declaration that the policy obligates the insurer to defend and indemnify the entity

with respect to a claim being asserted against the entity.  Because the focus is on whether the

insurer has a duty to defend a claim against the insured and because the claim has not yet been

sharply defined through litigation, the duty to indemnify must often await a later day to be

definitively resolved.

The principles governing "duty to defend" cases are well-settled under Virginia law.[2]

They are as follows:

    (i)       First, the duty to defend is ascertained by determining whether the allegations in

---

[2] Virginia Law governs the interpretation of the contract at issue in this case.  As this case is brought under federal diversity jurisdiction, Virginia choice of law rules apply.  *America Online, Inc. v. St. Paul Mercury Ins. Co.*, 347 F.3d 89, 92 (4th Cir. 2003) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts.").  And, "[u]nder Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635-36 (4th Cir. 2005) (quoting *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 419 (4th Cir. 2004); *see also, Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993) ("generally, the law of the place where an insurance contract is written and delivered controls issues as to its coverage.").  Finally, because the insurance contracts at issue in this case were delivered in the Commonwealth of Virginia, Virginia law applies to this dispute.

the underlying lawsuit fall within the scope of the policy terms that define the scope of coverage. This determination is guided by a combination of two rules: (1) the Exclusive Pleading Rule and (2) the Potentiality Rule. *See Transcontinental Ins. Co. v. Caliber One Indemnity Co.*, 367 F.Supp.2d 994, 1000 (E.D.Va. 2005).

(ii)     Under the Exclusive Pleading Rule an insurer's duty to defend is determined solely by the claims asserted against the insured in the underlying action. *Id.*

(iii)    And, under the Potentiality Rule, any possibility that a judgment against the insured will be covered under the terms of the insured's policy is sufficient to give rise to a duty to defend. *See Solers, Inc. v. Hartford Cas. Ins. Co.*, 146 F.Supp.2d 785, 791 (E.D.Va. 2001). As a result, "an insurer's duty to defend is broader than its duty to indemnify." *Transcontinental Ins. Co. v. Caliber One Indemnity Co.*, 367 F.Supp.2d 994, 1000 (E.D.Va. 2005).

(iv)    The party seeking coverage under an omnibus clause bears the ultimate burden of proving by a preponderance of the evidence that it is entitled to coverage. *See Hartford Fire Ins. Co. v. Davis*, 246 Va. 495, 498, 436 S.E.2d 429, 431 (1993).

(v)     Even so, the ordinary canons of insurance policy construction nonetheless operate. *See Town Crier, Inc. v. Hume*, 721 F.Supp. 99, 101 (E.D.Va. 1989). Thus, because the insurer is typically the drafter of the policy, ambiguities in the policy language are construed against the insurer and in favor of the policy holder. *See Id.*

(vi)    But where policy language is unambiguous, it must be construed consistent with its plain and ordinary meaning.[3]

---

[3] *See Gov't Employees Ins. Co. v. Moore*, 266 Va. 155, 164, 580 S.E.2d 823, 828 (2003) ([c]ontracts of insurance . . . are not made by or for casuists or sophists, and the obvious meaning of their plain terms is not to be discarded for some curious, hidden sense, which nothing but the exigency of a hard case and the ingenuity of an acute mind would discover.") (quoting *Bawden v. Am. Ins. Co.*, 153 Va. 416, 426, 150 S.E. 257, 260 (1929)); *Pham v. Hartford Fire Ins. Co.*, 419 F.3d 286, 289 (4th Cir. 2005) ("When the terms and provisions are clear, there must be given to such terms and provisions the construction and effect consonant with the apparent object.").

Given these principles, it follows that if Earth Tech's negligent actions, as alleged in the Underlying Lawsuit complaint, could potentially fall within the risk covered by the Auto Policy, then, pursuant to the Exclusive Pleading Rule and the Potentiality Rule, U.S. Fire has a duty to defend. *See Brenner v. Lawyers Title Ins. Corp.*, 240 Va. 185, 189, 397 S.E.2d 100, 102 (1990). But, "if it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations, 'it has no duty even to defend.'" *Id.* (citing *Travelers Indem. Co. v. Obenshain*, 219 Va. 44, 46, 245 S.E.2d 247, 249 (1978)).

The next step in the duty to defend analysis is to identify the policy language at issue. Because Earth Tech is not a named insured, it must look elsewhere in the policy to find a basis for extending coverage beyond specifically named insureds. Earth Tech, in this respect, points to the Auto Policy's omnibus clause, which provides that, in addition to Capitol, "anyone else is an insured while using with your permission a covered auto you own, hire, or borrow." The complaint in the Underlying Lawsuit alleges two specific acts of negligence by Earth Tech: (i) that Earth Tech "negligently undertook to direct traffic on State Road 363, while Blash attempted to back the semi-trailer into the St. Mark's Refinery Complex;" (ii) that Earth Tech negligently failed to provide "adequate visual warning devices." Comparing the complaint with the omnibus clause reveals two interpretative issues disputed by the parties. First, the parties dispute whether Earth Tech was "using" the tractor-trailer when the accident occurred.[4] Second, the parties

---

[4] The parties did not squarely address whether, assuming that the tractor-trailer was a "hired auto" being "used" by Earth Tech, such "use" was with the "permission" of Capitol. Because this question is intertwined with the interpretative questions addressed here, and because it is not alone dispositive, it will not be separately addressed.

dispute whether the tractor-trailer is a "hired auto" for purposes of the omnibus clause.[5]  If either

of these questions is answered in the negative, Earth Tech is not an insured under either the Auto

Policy or the Excess Policy, and U.S. Fire has no duty to defend in the underlying lawsuit.[6]

**Was Earth Tech "Using" the Semi-Trailer?**

U.S. Fire has no duty to defend Earth Tech under Capitol's auto policy or excess policy

unless Earth Tech's employee was "using" the tractor-trailer.  The question then, is whether an

entity whose employee acts as a flagman for another entity's vehicle is thereby "using" the

vehicle.[7]  While the Virginia courts have not addressed the definition of "using" in the specific

context of an omnibus clause, courts elsewhere have done so with mixed results.[8]  The more

---

[5] This issue, first raised in oral argument on the parties' cross-motions for summary judgment, was addressed at length in the parties' supplemental briefs.

[6] Because the Excess Policy provides that "the words 'you' and 'your' refer to any person or organization who qualifies as an insured in all the underlying policies listed in Item 5 of the Declarations," and because Item 5 lists only the Auto Policy, the determination of who is insured under both insurance policies is the same.

[7] While the complaint in the Underlying Lawsuit does not specifically state that the Earth Tech employee was acting as a flagman for the tractor-trailer just prior to the accident, a broad reading of the complaint, counseled by the Rule of Potentiality, coupled with the fact that the parties stipulated that the Earth Tech employee was acting as a flagman, compels this interpretation of the complaint.

[8] *Compare Belser v. Rockwood Casualty Ins. Co.*, 791 A.2d 1216, 1221 (Pa. Super. Ct. 2002); *Colfax v. Johnson*, 270 Kan. 7, 11 P.3d 1171, 1177 (2000) (holding that a lookout is not "using" a vehicle entitled to liability coverage under an insurance policy); *Apcon Corp. v. Dana Trucking*, 623 N.E.2d 806, 811 (Ill. App. Ct. 1993) ("We conclude that in order to constitute a 'use' or be a 'user' under the policy, such as to be an insured, one must be in operation of the vehicle."); *J. Scheer & Sons Co. v. Travelers Indemnity Co.*, 229 N.Y.S.2d 248, 251 (N.Y. Sup. Ct. 1962) (holding that an insurance company did not have a duty to defend the plaintiff, because providing directions to a concrete mixing truck does not constitute "use" of the truck); *Wellman-Lord Engineers, Inc. v. Northwestern Mutual Ins. Co.*, 222 So.2d 436, (Fla. Dist. Ct. App. 1969) (directing a concrete truck to close to the edge of a pit so that it fell in is not 'use' for purposes of liability insurance coverage) *with County of Wyoming, New York v. Erie Lackawanna Ry. Co.*,

persuasive cases have held that the public purpose behind the passage of omnibus clause statutes compels a liberal construction of the words "use" or "using" that encompasses the provision of directions or hand signals to the operator of a vehicle.  For example, in *Liberty Mut. Ins. Co. v. Steenberg Constr. Co.*, 225 F.2d 294 (8th Cir. 1955), the Eight Circuit relied on the "public demand" for broader coverage that served as the impetus for omnibus clauses when it held that the provision of directions to a cement truck driver was "use" of the cement truck.  *Id.* at 296-97.

In the end, however, it is not necessary to choose between competing lines of authority from other jurisdictions because, although the Supreme Court of Virginia has not addressed this specific issue in the context of an omnibus clause, it has done so in the context of the Underinsured Motorist Provision (UIM),[9] consistently adopting a broad construction of "use" or "using" in that context.[10]  Because the Supreme Court of Virginia has repeatedly called for a

---

360 F.Supp. 1212, 1219 (W.D.N.Y. 1973) (interpreting the "use" of a vehicle as extending to such activities as "signaling an operator whose vision is obscured" and to "supervising and giving instructions to the operator."); *Liberty Mut. Ins. Co. v. Steenberg Constr. Co.*, 225 F.2d 294, 297 (8th Cir. 1955) (broadly interpreting the word "use" or "using" in an omnibus clause as encompassing the provision of directions to the driver of a cement truck); *Ins. Co. of North America v. Royal Globe Ins. Co.*, 631 P.2d 1021, 1022 (Wash. Ct. App. 1981) ("It is recognized that the control which is the equivalent of use, so as to bring the person exercising control within the scope of the omnibus clause, may be exercised by giving signals to the actual operator of the vehicle."); *Blue Bird Body Co. Inc. v. Ryder Truck Rental, Inc.*, 583 F.2d 717, 724 & n.4 (5th Cir. 1978); *Western Casualty and Surety Co. v. Crawford*, 635 F.2d 667, 670 (8th Cir. 1980).

[9] *See* Va. Code § 38.2-2206.

[10] *See, e.g., Slagle v. Hartford Ins. Co. of the Midwest*, 267 Va. 629, 638, 594 S.E.2d 582, 587 (2004) (man directing a tractor-trailer backing out of a driveway was "using" the tractor-trailer for purposes of the UIM); *Randall v. Liberty Mut Ins. Co.*, 255 Va. 62, 67-68, 496 S.E.2d 54, 57 (1988) (holding that a highway worker was "using" his employer's vehicle while placing lane closure signs along the side of a highway); *Edwards v. Government Employees Ins. Co.*, 256 Va. 128, 500 S.E.2d 819 (1998) (holding that the named insured was "using" an automobile when changing its tire); *Great American Ins. Co. v. Cassell*, 239 Va. 421, 424, 389 S.E.2d 476, 477 (holding that a fire fighter was "using" a fire truck when he was standing 20-25 feet from the

broad interpretation of the omnibus clause in other contexts,[11] and because there is no reason to interpret the words "use" or "using" in an omnibus clause differently from the interpretation given to the words "use" or "using" in the context of the UIM,[12] the same result should obtain here, namely the terms "use" and "using" in the omnibus clause should be broadly construed to include a flagman's provision of directions to a vehicle. Given this, and given the operation of the Potentiality Rule, it follows that U.S. Fire, on this basis, would have a duty to defend Earth Tech against a claim in the Underlying Lawsuit that Earth Tech's employee caused the accident by acting negligently as a flagman.

**"Hired Auto" Provision**

Yet, the duty to defend analysis cannot end here for even if Earth Tech, through its flagman employee, was "using" the tractor-trailer within the meaning of the policy, it cannot claim coverage without also showing that the tractor-trailer was a "hired auto" within the meaning of the policy. Specifically, the question here is whether Capitol hired the autos themselves, thereby entitling it or any of its permittees to claim coverage for the use of the autos, or whether Capitol hired FCI to perform transportation services involving autos, in which case

---

truck using a clipboard and writing pad that were stored in the truck).

[11] *See, e.g., Haislip v. Southern Heritage Ins. Co.*, 254 Va. 265, 269, 492 S.E.2d 135, 137 (1997) (the omnibus clause should be "liberally construed to accomplish its intended purpose."); *City of Norfolk v. Ingram*, 235 Va. 433, 437, 367 S.E.2d 725, 727 (1988) ("The statute is to be liberally construed to effectuate insurance coverage to permissive users."); *Storm v. Nationwide Mutual Ins. Co.*, 199 Va. 130, 135, 97 S.E.2d 759, 762 (1957) ("The legislation having been enacted for the benefit of the injured parties, it is to be liberally construed so that the purpose intended may be accomplished.").

[12] *See Conkling v. Commonwealth*, 45 Va. App. 518, 521-22, 612 S.E.2d 235, 237 (2005) ("Because the Code of Virginia is one body of law, we may consult other statutes using the same phraseology to assist us in divining legislative intent.").

someone using those autos would not be entitled to coverage under Capitol's policy.

The Virginia courts have provided little guidance in defining a "hired auto" in the context of subcontractor's vehicles for purposes of the omnibus clause.  Clearly, at some point, the distinction between a hired auto and a company hired  to perform transportation services must be drawn, lest a "hired auto" clause be construed to cover every auto involved, however tangentially, in the provision of a service.  *See Toops v. Gulf Coast Marine Inc.*, 72 F.3d 483, 487 (5th Cir. 1996).   In recognition of this problem, courts distinguishing "hired autos" from transportation services generally have done so depending on the level of control over the auto exercised by the entity claiming coverage.[13]  Generally speaking, the insured will be deemed to have exercised sufficient control if it had significant authority over such matters as the choice of the vehicle, where it was to travel, by what routes, and for what purposes.  *See Holmes v. Brethren Mut. Ins. Co.*, 868 A.2d 155, 159 (D.C. 2005).  Similarly, the Eighth Circuit, interpreting Texas law, has held that the following considerations required a finding that the auto of a subcontractor was not "hired" for purposes of an insurance contract: (1) the subcontractor chose the number of trucks, how many trucks and which drivers to send in performing transport services, (2) the subcontractor maintained the trucks, (3) the subcontractor carried insurance on

---

[13] *See, e.g., Toops,* 72 F.3d at 487; *Hargrove v. Missouri Pacific R.R. Co.,* 780 So.2d 454, 463 (La. Ct. App. 2001); *Wolverine Ins. Co. v. State Auto. Mut. Ins. Co.*, 415 F.2d 1182, 1184 (6th Cir. 1969) ("The right to control of equipment is generally regarded as the critical distinction between the 'hired automobile' and the 'nonowned automobile' for insurance contract purposes."). Couch on Insurance § 118:46 ("The key inquiry regarding whether an automobile will fall within the hired automobiles provision of the policy is whether the insured exercised dominion, control or the right to direct the use of the vehicle.").  *But see Pawtucket Mut. Ins. Co. v. Hartford Ins. Co.*, 147 N.H. 369, 373, 787 A.2d 870, 873 (2001) (holding that where a policy fails to define "hired auto," the common definition of "hire" does not require an element of control and the court declined to add this restrictive requirement to the policy).

-14-

the trucks; (4) the subcontractor had the necessary permits to perform the transport services; (5) the subcontractor ultimately paid for the fuel; (6) the driver was an employee of the subcontractor; (7) the drivers were free to choose their own routes for delivery. *Chicago Ins. Co. v. Farm Bureau Mut. Ins. Co. of Arkansas, Inc.*, 929 F.2d 372, 374 (8th Cir. 1991).

Courts following this logic have held that vehicles driven by independent contractors will not therefore be considered "hired autos" for purposes of insurance policies. *See, e.g.*, *Gore v. State Farm Mut. Ins. Co.*, 649 So.2d 162, 165 (La. Ct. App. 1995) (independent contractor's vehicle was not a "hired auto" because contracting company did not exercise any control over the vehicle). As one leading commentator has put it: "In those situations in which there is no policy definition of this term, in order for a vehicle to constitute a 'hired' automobile under this provision, there must be a separate contract by which the vehicle is hired or leased to the insured for the insured's exclusive use or control." Steven Plitt, Daniel Maldonado, and Joshua D. Rogers, 8A Couch On Insurance § 118:45 (3d ed. 2005) (citing *Toops v. Gulf Coast Marine Inc.*, 72 F.3d 483, 487 (5th Cir. 1996)). Were the Supreme Court of Virginia to address this issue, it would likely follow this persuasive authority and conclude that whether the tractor-trailer is a "hired auto" depends on the control Capitol exercised over the vehicle.

Given this, it follows that the tractor-trailer at issue here is not a "hired-auto" but an auto separately owned and operated by Capitol's subcontractor, FCI. The terms of the contract between Capitol and FCI establish that the tractor-trailer was not specifically "hired" by Capitol, but was simply the means by which FCI was performing the transportation services required by the contract. It is undisputed that Capitol, pursuant to its subcontract with Earth Tech, hired FCI to transport materials contaminated with Benzene from the St. Mark's Refinery Complex to a

-15-

facility in Mobile, Al in a vacuum trailer.  The largest single line item in the quote provided by

FCI was for "transportation services," and the quote did not specify any particular vehicle, but

required only that it be a "tanker vac (any type)."  Capitol provided to FCI the dates on which the

transportation services were to be performed, but did not specify a driver or route.  The driver of

the tractor-trailer, Blash, was an employee of FCI, not Capitol.  Further, FCI paid for any fuel

itself, and also paid any transportation or waste taxes.  Nor was Capitol present to direct the

semi-trailer on the day of the accident.  Thus, the record demonstrates that Capitol did not

exercise any control over the vehicle beyond specifying the type of vehicle and the locations of

the pick-up and delivery of the material.  Because Capitol was interested only in the results of

transportation from point A to point B, and did not otherwise exercise any control over the

transportation of the vehicle, the vehicle was not a "hired auto," and therefore it was not covered

by Capitol's insurance policy with U.S. Fire.[14]

> This conclusion is consistent with the Supreme Court of Virginia's admonition that:
>
> in order for one's use and operation of an automobile to be within the meaning of
> the omnibus coverage clause requiring permission of the named insured, the latter
> must, as a general rule, own the insured vehicle or have such an interest in it that
> he is entitled to the possession and control of the vehicle and in position to give
> such permission.

*Nationwide Mut. Ins. Co. v. Cole*, 203 Va. 337, 341, 124 S.E.2d 203, 206 (1962).  *Accord*

---

[14] In contrast to the dispute over whether Earth Tech's employee was "using" the tractor-trailer, the dispute over whether the tractor-trailer was a "hired auto" depends not on the complaint of the Underlying Lawsuit, but on the parties' stipulation concerning the terms of the contract between Capitol and FCI.  There is, therefore, no reason for the operation of the Potentiality Rule in this context.  The complaint in the Underlying Lawsuit includes no allegations concerning whether the tractor-trailer was a "hired auto" and indeed, the question only arose in the course of oral argument.  In this atypical situation where the coverage is decided on stipulated facts, the duty to defend becomes congruent with the duty to indemnify.

*Virginia Mut. Ins. Co. v. Brillhart*, 187 Va. 336, 343, 46 S.E.2d 377, 380 (1948).  Because the facts presented in the case at bar clearly demonstrate that Capitol neither possessed nor controlled the tractor-trailer, Capitol could not give permission to the Earth Tech employee when he "used" the semi-trailer by providing directions.

## IV.

In conclusion, although Earth Tech's employee was "using" the vehicle at the time of the accident, the vehicle was not a "hired auto" for purposes of the insurance policy and therefore, U.S. Fire has no duty to defend Earth Tech in the underlying complaint.  For this reason, Earth Tech's motion for summary judgment is denied and U.S. Fire's motion for summary judgment is granted.  An appropriate order will issue.


_____/s/_____
Alexandria, VA                                                                            T. S. Ellis, III
January 4, 2006                                                                        United States District Judge